**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 8, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SPRINGFIELD HOLDING
COMPANY LTD LLC,

      Plaintiff - Appellee,

and

MARK W. REINITZ; ROGER L.
KINNARD; DAVID H. KINNARD,

      Plaintiffs-Counter-Defendants-
      Appellees,

v.

ROBERT STONE, M.D.; THE
CHILDREN'S FUND, an Illinois
limited liability company; ROBERT L.
STONE, a/k/a Robert L. Stone the III;
CYNTHIA A. STONE,

      Defendants-Counter-Claimants -
      Appellants.

No. 08-6210
(D.C. No. 07-CV-00250-R)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Defendants-Counter-Claimants-Appellants—Robert L. Stone, Cynthia A. Stone, Robert Stone, M.D., and The Children's Fund (referred to collectively as the Stones)—appeal the district court's judgment in favor of the Plaintiffs-Counter-Defendants-Appellees, David Kinnard, Roger Kinnard, Mark Reinitz, and Plaintiff-Appellee Springfield Holding Co. (referred to collectively as the Kinnards, given that the principal actors are David and Roger Kinnard). The primary issue on appeal is whether the district court erred in concluding that the Stones no longer maintain an ownership interest in a set of business entities in which they had previously held a minority interest. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm the district court's judgment.

## Background

The present case arises from a complicated series of business transactions between the Stones and the Kinnard brothers, David and Roger, that turned sour. Because the district court set forth the confused tangle of transactions with as much clarity as is practicable, see Kinnard v. Stone, No. CIV-07-250-R, 2008 WL 4000445, at *1-5 (W.D. Okla. Aug. 25, 2008), we will not exhaustively recount the facts of the case here. A relatively cursory overview of the facts will suffice. Together, Robert L. Stone and the Kinnard brothers had formed a number of limited liability companies, partnerships, and other entities to manage their joint business ventures in rental real estate. These entities functioned under an

-2-

"aggregator," the Oklahoma Investment Group ("OIG"). This "aggregator," which had virtually no assets, was used to run the day-to-day operations of the various entities and receive and disburse money for each entity. OIG utilized a single bank account for the entities, although separate books and records were kept for each one. David Kinnard was the most active member of the investors, and he acted as the managing partner of OIG. Robert L. Stone was not an active participant in OIG's internal affairs, as he eventually moved to Chicago.

The problems that led to this litigation find their root in the agreement between David Kinnard and Robert L. Stone that the Stones would receive a monthly allowance or distribution of $17,000. These monthly payments continued from 1996 through 2005, though they apparently ceased for a period during 1999 for reasons that are disputed by the parties. The Stones contend that the payments were withheld as leverage in a dispute between the Stones and Kinnards over the distribution of proceeds from a lawsuit (which the parties refer to as the "Beatrice litigation") against a third party not involved in this litigation. The Stones further claim that the Kinnards still owe them the arrearage that arose in 1999. On the other hand, the Kinnards maintain that the payments were merely advances on the Stones' distributive share of income from the various entities.[1]

_____

[1] At the end of the year, to the extent that advances exceeded distributive net income, the excess was treated as an account receivable (a loan to the recipient). Aplt. App. 774-75, 1048-49.

The problems between the parties subsequently deepened when Robert L. Stone began to seek loans from the Kinnards. Mr. Stone sought a loan from the Kinnards in 2003, and David Kinnard agreed to grant him the requested money in exchange for an "assignment" of Stone's interest in one of the entities owned by the investors, Cinnamon Creek L.L.C. The nature of this exchange is also disputed; the Stones contend that it was a loan, while the Kinnards argue that it was a transfer of the Stones' ownership share with an accompanying right to repurchase. This was a critical transaction, because it set the precedent for the subsequent financial dealings between the Stones and the Kinnards. In any event, the Stones eventually reestablished their ownership interest in Cinnamon Creek by paying David Kinnard $130,000.

The transactions between the Stones and Kinnards then began to multiply. In 2004, Stone once again used his Cinnamon Creek interest to secure money from David Kinnard. Later in that year, in separate transactions, the Stones assigned to the Kinnards their interest in other entities, including Peppertree Partners, Inc., Peppertree Partners, Ltd., Windrock Associates, Summer Pointe, and the Springfield Entities in exchange for cash. The Stones also apparently executed two promissory notes in relation to other disputed debts, and David Kinnard assumed those obligations as part of the transactions between the Stones and Kinnards. The Kinnards then evidently informed the Stones that no further money would be forthcoming, as they had concluded that the Stones had

-4-

transferred all of their ownership interests in the various entities to the Kinnards.

The Kinnards initiated this litigation by bringing an action for declaratory judgment, seeking a declaration that the Stones no longer maintained an interest in any of the entities. The Stones counterclaimed, seeking a full accounting for each of the entities and a declaratory judgment that they did in fact still have an ownership interest in each of the entities. Accordingly, the central question posed by these competing claims was whether the aforementioned transactions were loans or whether they were actually transfers of the Stones' ownership interest. Additional issues were also implicated, in that the Stones challenged the adequacy of the consideration the Kinnards paid for the Stones' ownership interest and contended that they were due a full accounting. Ultimately, the district court concluded that the Stones had sold all of their interests to David Kinnard for adequate consideration, and that they had received an adequate accounting. Kinnard, 2008 WL 4000445 at *7-10. The Stones now appeal the district court's judgment, raising several alleged errors on the part of the district court.


## Discussion

We review the district court's findings of fact for clear error. Fed. R. Civ. P. 52(a)(6); La Resolana Architects, PA v. Reno, Inc., 555 F.3d 1171, 1177 (10th Cir. 2009). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and

-5-

firm conviction that a mistake has been committed." Anderson v. City of

Bessemer City, 470 U.S. 564, 573 (1985) (citation omitted). If the district court's

findings are plausible, we will not reverse. Id. at 573-74. Our review of

questions of law, on the other hand, is de novo. La Resolana Architects, 555 F.3d

at 1177. We review mixed questions of law and fact under either the clearly

erroneous standard or the de novo standard, depending on whether the inquiry is

primarily factual or legal. Hollern v. Wachovia Secs., Inc., 458 F.3d 1169, 1175

n.4 (10th Cir. 2006).

I.     Sale of the Stones' Interests in the Business Entities

The Stones' first argument is that the district court erred by concluding that

there was a valid contract for the sale of their ownership interest because, they

contend, there was no meeting of the minds. The Stones correctly point out that

as a matter of law there must be a meeting of the minds in order to form a

contract.[2] Beck v. Reynolds, 903 P.2d 317, 319 (Okla. 1995). However, we

review the question of whether there was actually a meeting of the minds for clear

error, as it is a factual inquiry. See Homestead Golf Club, Inc. v. Pride Stables,

224 F.3d 1195, 1200 n.5 (10th Cir. 2000). Here, we cannot conclude that the

district court clearly erred, given the factual record before us. The parties

presented conflicting evidence, which the district court resolved in favor of the

_____

[2] Both parties agree that Oklahoma law governs in this case.

-6-

Kinnards.

The most important piece of evidence supporting the district court's conclusion is the handling of the initial transaction relating to Cinnamon Creek. In 2003, Robert L. Stone sought a loan from David Kinnard, and in so doing proposed a document entitled "Assignment of Partnership Interest as Collateral for Note" offering his interest in Cinnamon Creek as collateral for a loan. Aplee. Supp. App. 3. However, David Kinnard rejected this offer and the proposed document because he wanted outright ownership rather than a collateral interest. Having had his proposed loan arrangement rejected, Mr. Stone ultimately signed a document that he referred to as an "unconditional transfer of [his] partnership interest" in Cinnamon Creek. Aplee. Supp. App. 4.

The instrument provided that Robert L. Stone:

> hereby sells, assigns, transfers and conveys . . . all of his membership interests and other ownership interest of any kind in Cinnamon Creek, L.L.C., an Oklahoma limited liability company (the "Company"), and all rights appurtenant thereto, including but not limited to the right to receive distributions, profits or income of any kind from the Company.

Aplt. Supp. App. 6. The attorney who drafted the document called it "an Assignment of Membership Interest" in an e-mail to the principal parties, referred to the "$100,000 sale price," and informed Mr. Stone that they were preparing an agreement whereby he could "repurchase his membership interest." Aplee. Supp. App. 5. Further, the evidence suggests that Mr. Stone was aware of the difference

between these two documents when he inquired why the transaction was described "as a sale-redemption and not as a loan." Aplee. Supp. App. 7. When Mr. Stone eventually repurchased his interest, David Kinnard advised him in writing that "[t]here is no loan. There is only an opportunity to buy back shares. Please read these docs carefully."[3] Aplee. Supp. App. 8. This sequence of events strongly suggests that the Stones attempted to secure a loan, but failed to do so; rather, they ultimately entered into a sale and buy-back agreement—and they apparently did so knowingly. This is of significance, given that the parties then proceeded to use the same unconditional transfer document in all the subsequent transactions.[4]

In light of the documentary evidence and testimony, ample evidence supports the district court's finding/conclusion that the Stones knew they were selling their interests rather than merely utilizing their interests as security. To be sure, the Stones point to evidence which, if credited, might support their position.

---

[3] There is further evidence of the Stones' knowledge of the nature of the transaction into which they had entered. When Cynthia Stone assigned her interest in Summer Pointe using an identical unconditional transfer document, an OIG employee informed her that the assignment documented a sale, not security for a loan.

[4] The parties agree that identical documents were used for all the relevant transactions. However, they disagree as to whether the first transaction was a loan or a sale. Given our standard of review, we have no basis to reverse the district court's eminently reasonable conclusion that it was a sale. Accordingly, we cannot rely on this first transaction to show that the remainder were loans, as the Stones would have us do.

For instance, the Stones testified that they had "no idea" they were selling their interests, produced e-mails wherein the transactions were referred to as loans, and elicited testimony from the Kinnards that the Stones frequently referred to the transactions as "loans" in their communications. Further, they point to testimony to the effect that payments were "reclassified" as purchases after the fact. This testimony, they suggest, shows that there was no sale for an agreed-upon purchase price, even though the district court concluded there was a sale and found the amount of each purchase price based on testimony and exhibits entered into evidence. See Kinnard, 2008 WL 4000445, at *2-3.

"But pointing to conflicting evidence inconsistent with the district court's finding is insufficient, standing alone, to establish clear error . . . ." Penncro Assocs., Inc. v. Sprint Spectrum, L.P., 499 F.3d 1151, 1161 (10th Cir. 2007). This is necessarily so, given that "every trial is replete with conflicting evidence, and in a bench trial, it is the district court[] which enjoys the benefit of live testimony[,] . . . has the opportunity firsthand to weigh credibility and evidence, [and] has the task of sorting through and making sense of the parties' competing narratives." Watson v. United States, 485 F.3d 1100, 1108 (10th Cir. 2007). The district court has the discretion to credit some individuals' testimony above that of others and weigh the competing evidence, as long as its conclusion is plausible. Anderson, 470 U.S. at 573-74. That is the very nature of the function of the district court in a bench trial, and we may not second-guess the district court's

determinations absent clear error. Here, the district court had strong corroborating evidence suggesting that the hundreds of thousands of dollars received by the Stones were advances on distributions, rather than guaranteed payments, and that the Stones knowingly sold their interests to obtain cash. We find no clear error.

## II.     Adequacy of the Consideration Provided

The Stones next challenge the adequacy of the consideration they received for the sale of their ownership interests. In particular, they argue that the district court erred by finding that David Kinnard paid valid consideration for the Stones' interests. According to the Stones, neither the forgiveness of the promissory notes executed by Robert L. Stone nor the funds borrowed by David Kinnard from the Springfield Entities can serve as consideration. The Stones' challenge raises a mixed question of law and fact.

### A.     The Promissory Notes

There are two promissory notes at issue. The first was a $500,000 note executed on March 11, 2005, by Robert L. Stone to Bernice Kinnard, the mother of the Kinnard brothers. The record shows that the Stones had borrowed money from Mrs. Kinnard in the 1990s, and this promissory note memorialized the debt. The second promissory note was executed on March 16, 2005, by Robert L. Stone to Roger and David Kinnard for $250,000. This note apparently stemmed from the dispute between the Stones and Kinnards over the proceeds from the Beatrice

litigation. The Stones contend that the district court erred as a matter of law in finding these notes to be valid consideration because they were not "accepted," because they were not a detriment to David Kinnard, because they were executed after the final assignment of the Stones' interests, and because they were of uncertain value. None of these contentions, which actually involve a primarily factual inquiry, have merit.

First, the district court found as a matter of fact that David Kinnard "was assuming the debt, making him liable for payment to his mother" on the first promissory note, Kinnard, 2008 WL 4000445, at *3, and there is testimony sufficient to uphold the district court's conclusion on this point. Further, there is no evidence that the Kinnard brothers somehow rejected the second promissory note relating to the Beatrice litigation. Accordingly, the Stones' argument that the promissory notes were not "accepted" misses the mark. Second, the first promissory note was a detriment to David Kinnard, because he was assuming the debt that Robert L. Stone admitted he owed to David Kinnard's mother. Accordingly, the Stones' argument is misguided insofar as they argue that David Kinnard merely attempted to forgive a note that was not his. Furthermore, the evidence supports the finding that the Kinnards forgave the second promissory note and can no longer enforce it against the Stones. This also constitutes a detriment and, hence, consideration.

Finally, it is of little consequence here that the notes were executed

-11-

subsequent to the final assignment of the Stones' interest; this fact does not render their value sufficiently uncertain such that there was no detriment to the Kinnards or benefit to Robert L. Stone. Rather, while the notes were technically executed after the final assignment of the Stones' interest, it appears that these notes simply memorialized *pre-existing* debts which the Kinnards forgave or assumed as part of the assignments. This is sufficient under Oklahoma law. See Okla. Stat. tit. 15 § 106. See generally Taylor v. Taylor, 389 P.2d 622, 627-28 (Okla. 1964) (stating that a disputed claim is good consideration, even if that claim later is demonstrated to be unfounded). Accordingly, the district court properly treated the promissory notes as good consideration.[5]

B.      Use of Funds Borrowed from the Springfield Entities

The Stones make two primary arguments relating to the payments that David Kinnard made to Robert L. Stone. First, they argue that the payments cannot serve as consideration because they were merely payments under a prior obligation (namely, the alleged arrearage in payments on the $17,000 monthly distribution). Second, they argue that the payments are null and void because they actually came from Springfield in violation of the requirement that a partner only borrow from the entity with the written consent of the other partners.

---

[5] In any event, we note that the undisputed testimony of the Plaintiff's expert witness was that the consideration for the purchases would have been reasonable even without including the discharge of the Stones' obligation under the promissory notes. Aplt. App. 1136-40.

The first argument is plainly without merit. It is a factual question whether the Kinnards' periodic failure to pay the $17,000 monthly distribution created a "prior obligation" such that later payments would essentially constitute a satisfaction of the preexisting debt. The district court concluded that the monthly payments were not guaranteed payments, but rather were advances on the Stones' distributive share. Kinnard, 2008 WL 4000445, at *6. This conclusion was not clearly erroneous, given that it is amply supported by testimony from David Kinnard, the accountant for the entities involved, the Kinnards' expert witness, and the Stones' tax returns. The district court had the discretion to credit this testimony over that of the Stones, and we have no basis for finding clear error. See Penncro Assocs., 499 F.3d at 1161.

The second argument proffered by the Stones also fails. The Stones contend that David Kinnard took the funds from Springfield in violation of the Springfield operating agreement, and that, *ergo*, the payments were void and of no effect. However, this argument depends on the related issue of whether the Stones had waived their right to enforce the pertinent provision in the Springfield operating agreement. The district court concluded that the Stones had waived their rights by previously borrowing from Springfield without the written consent of the Kinnard brothers. Kinnard, 2008 WL 4000445, at *7.

Under Oklahoma law, in order to waive a right, "there must be an actual intention to relinquish a known right, either expressly, or by such conduct as

-13-

warrants an inference of such relinquishment." Atlas Life Ins. Co. v. Schrimsher, 66 P.2d 945, 948 (Okla. 1937); see Whitmire v. Zolbe, 403 P.2d 445, 448-49 (Okla. 1965). The district court correctly concluded that this standard had been satisfied, given that the Stones had taken a loan from Springfield without the other owners' written consent on prior occasions. Moreover, the arrangement whereby the Stones consistently took advances of their distributive share of income from Springfield—thereby creating an account receivable or debt in favor of OIG and Springfield—also supports the district court's finding of waiver. Thus, the Stones intentionally bypassed the written consent provision by taking the loan in contravention of the provision. Accordingly, their waiver was knowing and demonstrated by explicit conduct, as is required by Oklahoma law. Atlas Life Ins. Co., 66 P.2d at 948. The Stones cannot now use the provision that they bypassed against their erstwhile partners.

The Stones' arguments before this court that they did not waive the provision in the operating agreement miss the key point raised by the district court.[6] The Stones waived their rights under the operating agreement not because *David Kinnard* had taken a loan from Springfield without written consent (which is how the Stones frame the argument); rather, they waived their rights by taking

_____

[6] We do not need to reach the Stones' argument that the Kinnards breached their fiduciary duties, as it was not properly raised in the district court. The Stones attempted to amend their counterclaim to add an additional claim for breach of fiduciary duty, but the district court rejected their motion as untimely.

-14-

a loan from Springfield *themselves* without written consent.  Accordingly, the issue is not whether the Stones' failure to object to another party's breach constitutes waiver; instead, the issue is whether the Stones' own violation of the agreement operates as a waiver.  As noted above, we conclude that it does. Furthermore, we recognize that the Stones argue to this court that they "took that loan from the Kinnard Brothers individually, not from Springfield," Aplt. Br. 39, but there is sufficient factual support for the district court's conclusion that they did take the loan from Springfield that we cannot say this factual finding was clear error.  As noted above, the most significant evidence supporting the district court's conclusion is that Mr. Stone himself testified that he had taken a loan from Springfield without written consent, and had signed a promissory note payable to Springfield.  Accordingly, we find no error.

Having concluded that the Stones waived their right to enforce the pertinent provision in the Springfield operating agreement, we must also conclude that the funds David Kinnard provided to the Stones constituted valid consideration.  The district court's conclusion that the Stones "received reasonable consideration for their interests in the subject entities," Kinnard, 2008 WL 4000445, at *8, is not clearly erroneous given the underlying evidence which supports it.

III.    Unclean Hands

The Stones also contend that the district court erred by granting an equitable remedy to a party who it found to have "unclean hands."  The unclean

-15-

hands doctrine means, in general, that equity will not aid a party whose conduct has been "unlawful, unconscionable, or inequitable." Houston Oilers, Inc. v. Neely, 361 F.2d 36, 42 (10th Cir. 1966). However, "the doctrine . . . should [not] be applied in every case where the conduct of a party may be considered unconscionable or inequitable." Id. Here, we have no reason to conclude that the district court abused its discretion by not applying this doctrine. Id. ("The maxim admits of the free exercise of judicial discretion in the furtherance of justice."); see Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc., 562 F.3d 1047, 1058 (10th Cir. 2009) (reviewing application of unclean hands doctrine for abuse of discretion). In particular, we note that this argument was apparently not raised before the district court. It is based primarily on the Stones' argument that the Kinnards breached their fiduciary duty—a claim not properly presented below. Further, the Stones overstate the district court's finding regarding unclean hands. While the district court found that both parties had unclean hands regarding the Springfield operating agreement's prohibition on loans without written consent, Kinnard, 2008 WL 4000445, at *7, it did not so find regarding the broader fiduciary claims now advanced by the Stones. Accordingly, we find that the district court did not abuse its discretion.

IV.    Right to an Accounting

Finally, the Stones argue that the district court erred by denying them the right to a full accounting. According to the Stones, a fair trial was impossible

-16-

with an incomplete accounting, and this inadequacy demonstrates that the district court erred by failing to grant them their requested relief. However, this misconstrues the issue. The district court actually held that the Stones had as a factual matter received a "full accounting of the entities, utilizing accepted principles of forensic accounting," not that they were not entitled to such an accounting. Kinnard, 2008 WL 4000445, at *10. We cannot say that this factual finding was clearly erroneous. An expert accountant testified that he was able to perform an accounting for all the entities involved given the tax returns and other information available to him, and that expert provided a full report with documentation. This evidence gave the district court a sufficient basis to conclude that an adequate accounting had been provided. Kinnard, 2008 WL 4000445, at *6 n.17. We find no clear error.

The district court's judgment is AFFIRMED. The motion to supplement the record is DENIED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge